UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RYAN W. THOMAS,<br><br>      Plaintiff,<br><br>      v.<br><br>CONSTELLATION ENERGY GENERATION, LLC,<br><br>      Defendant. | No. 24 CV 6184<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ryan Thomas worked at defendant Constellation Energy Generation, LLC's nuclear power plant as a senior site emergency preparedness specialist. Under the Nuclear Regulatory Commission regulations, Thomas was required to obtain unescorted access authorization. Unescorted access determinations were based on background investigations, including clinical assessments. During an interview with Constellation's contract clinician, Thomas disclosed that he received a disability rating from Veterans Affairs for post-traumatic stress disorder in 2019. Thomas had not disclosed this diagnosis in his medical history questionnaire. After multiple follow up interviews, Constellation denied Thomas unescorted access, citing trustworthiness and reliability concerns. Constellation then terminated Thomas due to his failure to maintain unescorted access. Thomas brings a claim under the Americans with Disability Act alleging that Constellation denied his unescorted access and terminated his position because of his disability. Constellation moves to dismiss.

I.  **Legal Standard**

When reviewing a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a court accepts all well-pled allegations as true and draws all reasonable inferences in favor of the plaintiff. *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 881 (7th Cir. 2022). "To survive a motion to dismiss, a plaintiff must plead 'only enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

II. **Facts**

Plaintiff Ryan Thomas worked for defendant Constellation Energy Generation, LLC from January 2006 until October 2023 as a senior site emergency preparedness specialist at a nuclear power plant. [1] ¶¶ 10, 32.[1] Thomas met Constellation's reasonable job performance expectations throughout his employment. [1] ¶ 12.

Constellation's facility was licensed by the Nuclear Regulatory Commission, which required Constellation to implement an Access Authorization and Fitness Duty Program. [1] ¶¶ 13–14 (citing 10 C.F.R. § 73.55(a)). Thomas's positions required him to obtain and maintain unescorted access authorization. [1] ¶ 11. Employees seeking unescorted access had to complete extensive background investigations, including psychological assessments. [1] ¶ 15. In 2022, Thomas was required to undergo a physical and mental health requalification. [1] ¶ 17. In his requalification medical

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. When a document has numbered paragraphs, I cite to the paragraph, for example [1] ¶ 1. The facts are taken from Thomas's complaint, [1].

history questionnaire, Thomas listed that he was diagnosed with anxiety disorder and received a prescription for Xanax. *Id.*

In June 2023, during a clinical interview, Constellation's Medical Review Officer asked Thomas whether he received a Veterans Affairs disability rating. [1] ¶ 18. Thomas told her that he received a 70% disability rating due to post-traumatic stress disorder in 2019. *Id.* Thomas had not disclosed this diagnosis in his medical history questionnaire. [1] ¶ 17.

Shortly after, the access authorization supervisor told Thomas that his unescorted access was revoked due to trustworthiness and reliability concerns pending an investigation, to collect his personal belongs, and to leave the station's protected area. [1] ¶ 19. Thomas's trustworthiness and reliability had never been questioned before, and he had never been disciplined. [1] ¶ 33.

The MRO asked for Thomas's VA evaluations, treatments, and his individual disability breakdowns and percentages, which Thomas provided. [1] ¶ 19. Thomas's VA mental health doctor also faxed a letter to the MRO stating that Thomas was not a threat to himself or others, and that he could perform his assigned job duties with no restrictions. [1] ¶ 23.

In August 2023, Thomas met with the access supervisor who asked why Thomas did not disclose his PTSD prior to 2023. [1] ¶ 20. Thomas explained that his attorney told him that he did not need to report his VA disability rating to his employer. *Id.* Thomas was cleared of trustworthiness and reliability concerns and told to complete a second clinical interview. [1] ¶ 21.

3

During the follow-up interview, the MRO told Thomas, "I think you are a liar and I am not going to believe anything you tell me in this interview." [1] ¶ 24. The MRO stated, "You either lied to the VA to get a higher disability rating and have been telling the truth to the company for all these years, or you have been telling the truth to the VA and have been lying to the company for all these years." *Id*. She continued, "If you truly had a 70% rating for PTSD, then you would be completely debilitated, impaired, and unable to function in daily life, so you obviously embellished and played up your symptoms to the VA to get more money and a higher rating." [1] ¶ 25. Thomas tried to explain that he had standard PTSD screening, filled out the form honestly, and that the VA doctor diagnosed him after discussing Thomas's experiences in Iraq. *Id*. The MRO interrupted Thomas saying, "I know how the VA application process works and I know the questions they ask, and the forms you fill out." *Id*. The MRO also accused Thomas of being medication seeking because he asked his VA doctor to prescribe ADHD medications in 2022 while he was also receiving Xanax from his civilian doctor. [1] ¶ 26. Thomas explained that he had not refilled his prescription for Xanax since 2019, which was noted in his prescription history. *Id*.

In September 2023, the access supervisor told Thomas that his unescorted access was denied for trustworthiness and reliability concerns because of "inconsistencies" between his interviews with the access supervisor and the MRO. [1] ¶¶ 29–30. Thomas was certain that he gave consistent answers, so he obtained notes from both interviews. [1] ¶¶ 29, 31. Upon reviewing the notes, he found that they

4

mischaracterized what was discussed, took statements out of context, and contained fabrications. [1] ¶ 31.

In October 2023, Constellation terminated Thomas's employment because he no longer had unescorted access. [1] ¶ 32. Thomas brings a claim under the Americans with Disabilities Act, alleging that Constellation denied his unescorted access authorization and terminated his employment because of his disability. [1] ¶ 1. Constellation moves to dismiss his claim. [10].

### III. Analysis

#### A. Judicial Review

Constellation argues that Thomas's claim cannot proceed because NRC regulations prohibit reconsideration of a Medical Review Officer's fitness determination, 10 C.F.R. § 26.189(d), and because a court cannot review the merits of Executive Branch security clearance determinations. [11] at 13–19.

According to Constellation, the denial of Thomas's unescorted access and his termination were predicated on the MRO's fitness determination pursuant to NRC regulations. [11] at 8, 17. Under 10 C.F.R. § 26.189(d), "[n]either the individual nor licensees and other entities may seek a second determination of fitness if a determination of fitness . . . has already been performed by a qualified professional." Constellation contends that Thomas therefore may not bring a claim under the ADA because it could result in a second determination of fitness. [11] at 18–19.

Thomas does not allege that the MRO made a negative fitness determination under 10 C.F.R. § 26.189. The reason given for the access denial was trustworthiness and reliability concerns. [1] ¶ 30. Fitness determinations are made to ensure that

5

"individuals are not under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties." 10 C.F.R. § 26.23(b). They also "[p]rovide reasonable assurance that individuals are trustworthy and reliable as demonstrated by the avoidance of substance abuse." 10 C.F.R. § 26.23(a). There are no allegations that the MRO determined that Thomas's PTSD prevented him from safely and competently doing his work. And he does not allege that the MRO determined that Thomas was untrustworthy or unreliable due to a failure to avoid substance abuse. Instead, Thomas's theory is the MRO and access supervisor misconstrued his interviews to raise trustworthiness and reliability concerns as a pretext for disability discrimination. [1] ¶¶ 28–31. Based on the allegations, there is no adverse fitness determination to review, and Thomas's lawsuit here would not result in a second determination of fitness.

Constellation also argues that judicial review is precluded by *Department of the Navy v. Egan*, which established that "outside nonexpert bod[ies]," including courts, cannot "review the substance" of Executive Branch security clearance decisions. 484 U.S. 518, 529 (1988); *see also Whitney v. Carter*, 628 F.App'x 446, 447 (7th Cir. 2016). Employment-related claims alleging adverse actions arising from security clearance determinations necessarily entail review of the merits of those determinations and are likewise barred by *Egan. See Campbell v. McCarthy*, 952 F.3d 193, 202–04 (4th Cir. 2020); *Toy v. Holder*, 714 F.3d 881, 886 (5th Cir. 2013); *Hall v.*

*Dep't of Labor*, 476 F.3d 847, 852–53 (10th Cir. 2007); *Perez v. FBI*, 71 F.3d 513, 514–15 (5th Cir. 1995).

But security clearances are different from unescorted access authorization. *See Toy*, 714 F.3d at 885; *Summerland v. Exelon Generation Co.*, 455 F.Supp.3d 646, 654–56 (N.D. Ill. 2020). The review, grant, and revocation of security clearances are subject to procedures imposed by Executive Order that address who may access classified information. *See* Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) (requiring the agency head or designee to make a "determination of eligibility for access" to classified information); Exec. Order No. 12,968, 60 Fed. Reg. 40245 § 5.2 (Aug. 2, 1995) (outlining the process for reviewing the denial or revocation of a security clearance). In contrast, different regulations govern the review, grant, and revocation of unescorted access to nuclear power plants. *See* 10 C.F.R. § 73.56. The NRC regulations also distinguish between unescorted access authorization and security clearances to access restricted data and national security information. *See* 10 C.F.R. Part 10 ("Criteria and Procedures for Determining Eligibility for Access to Restricted Data or National Security Information or an Employment Clearance"); 10 C.F.R. Part 95 ("Facility Security Clearance and Safeguarding of National Security Information and Restricted Data"). I am not convinced that unescorted access is the practical or legal equivalent to a security clearance for *Egan* purposes. *See Toy*, 714 F.3d at 885–86; *Summerland*, 455 F.Supp.3d at 654–56.

Judicial scrutiny of unescorted access authorizations is supported by *Exelon Generation Company v. Local 15, International Brotherhood of Electric Workers, AFL-*

*CIO*, 676 F.3d 566 (7th Cir. 2012). In *Exelon*, the court considered whether labor arbitrators hearing grievances under collective bargaining agreements were able to review the denial or revocation of unescorted access privileges under 10 C.F.R. § 73.56. *Id.* at 570. The court answered affirmatively, noting the NRC's longstanding position that labor arbitrators have the power to review access determinations. *Id.* at 573–75. The court also rejected the defendant's argument that even courts cannot review access denials. *Id.* at 572 n.3, 573. While *Exelon* did not address whether *Egan* precludes review of unescorted access determinations, it emphasized that the NRC has long permitted third-party review of such determinations. *Id.* at 575. Indeed, the NRC has taken the "clear position that, in a case of a mistaken access denial, 'an aggrieved individual could commence an action in a State or a Federal court.'" *Id.* at 572 n.3 (quoting 56 Fed.Reg. 18997, 19002 (1991)).

Constellation also points to 10 C.F.R. § 37.23(b), which states "[r]eviewing officials are the only individuals who may make trustworthiness and reliability determinations that allow individuals to have unescorted access." Constellation argues that this clearly prohibits third-party review and was also not considered in *Exelon*. [19] at 11. *Exelon* addressed a similar provision, 10 C.F.R. § 73.56(a)(4), which provides that "[o]nly a licensee shall grant an individual unescorted access." 676 F.3d at 573. Reading the provision in context, the court refused to interpret it as a ban on third-party review. *Id.* The court noted the provision was meant to delineate the relationship between a licensee and vendors hired to complete access determinations. *Id.* Looking to the context of § 37.23(b) similarly shows it does not ban third-party

8

review. Section 37.23 lists the requirements for licensee access authorization programs. Within that context, only reviewing officers may make trustworthiness and reliability determinations. The provision does not discuss whether such determinations may be challenged before a third party.

On the facts alleged, neither 10 C.F.R. § 26.189(d) nor *Egan* preclude the ability to review the merits of Thomas's claim. *See Summerland*, 455 F.Supp.3d at 654–56; *Hale*, 845 F.3d at 231 (holding that *Egan* did not apply where "physical fitness" requirements, not security clearance determinations, were at issue); *Toy*, 714 F.3d at 885–886 (same, where only FBI building access was at issue, although a statutory Title VII exception applied). Thomas's claim for disability discrimination does not require the court to make a trustworthiness and reliability determination or grant access; the question is whether Constellation's determination was a pretext for discrimination.

B.  **Americans with Disability Act**

The ADA prohibits employers from discriminating against qualified individuals based on disability in the discharge of employees and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). To state a claim under the ADA, Thomas must allege (1) he was disabled; (2) he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) he suffered an adverse employment action; and (4) the adverse action was caused by his disability. *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022). This "is not an exacting standard." *Brown v. Meisner*, 81 F.4th 706, 708 (7th Cir. 2023). "Specific facts are not necessary under Rule 8 because the plaintiff need

9

only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* The parties do not dispute that Thomas adequately pleads disability. *See* [1] ¶¶ 5, 9.

Constellation argues that, even taking the allegations as true, Thomas was not a qualified individual because he failed to maintain unescorted access and could no longer perform the "essential functions" of his job. [11] at 20. A qualified individual with a disability is someone who can satisfy the requisite skill, experience, education, and other job-related requirements of their position and perform the essential functions of the position, with or without accommodation. *Basith v. Cook Cnty.*, 241 F.3d 919, 927 (7th Cir. 2001); 29 C.F.R. § 1630.2(m). Thomas alleges that he always met Constellation's reasonable job performance expectations and could perform his assigned job duties with no restrictions. [1] ¶¶ 12, 23. NRC regulations required Thomas to maintain unescorted access authorization, [1] ¶ 11, and to satisfy a trustworthiness and reliability determination. *See* 10 C.F.R. § 73.56(c), (d)(2)(i). Constellation is correct that a legally defined job qualification is an essential function under the ADA. *See Bay v. Cassens Transp. Co.*, 212 F.3d 969, 974 (7th Cir. 2000) ("Under applicable DOT regulations, [the employer] was not allowed to permit [the plaintiff] to resume driving until he produced a copy of a doctor's certificate indicating he was physically qualified to drive, and nothing in the ADA purports to change that obligation."); *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 570, 573 (1999) (holding when the law sets job qualifications, "there [is] no basis to question [an employer's] unconditional obligation to follow the regulations and its consequent right to do so").

10

But Constellation gets ahead of itself by evaluating Thomas's qualification after the alleged discriminatory adverse employment action. According to Thomas, Constellation revoked this qualification discriminatorily based on his disability, rendering him unqualified. *See* [1] ¶¶ 28–31. Accepting his allegations as true, Thomas had unescorted access authorization before any discrimination occurred and was therefore a qualified individual. [1] ¶¶ 17, 21.

Constellation protests that it was acting in its capacity as an NRC licensee when it denied unescorted access and terminated Thomas's position. [11] at 7–8, 12–13; [19] at 9. Following this logic, Constellation argues that the access denial and termination cannot be considered "employment actions" under the ADA. *Id.* Constellation provides no support for the proposition that an employer's actions made in compliance with regulations are not "employment actions." *See id.* Constellation similarly argues that the access denial and termination cannot be considered "adverse" because Constellation was following regulatory requirements. An adverse action is one that "harm[s] . . . an identifiable term or condition of employment."[2] *Muldrow v. St. Louis*, 601 U.S. 346, 355 (2024). The harm need not be "significant," "serious or substantial." *Id.* The denial rendered Thomas unable to do his job and led to his termination. [1] ¶ 32. The access denial and termination harmed Thomas's employment and thus were adverse employment actions.

---

[2] *Muldrow* involved an adverse action under Title VII, but the same analysis applies under the ADA. *See Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 648 (7th Cir. 2023).

11

Constellation also argues that Thomas's termination and access denial were not motivated by his disability but were required by law, and therefore Constellation cannot be held liable for them. [11] at 19 (citing 29 C.F.R. § 1630.15(e) which provides a defense when "a challenged action is required or necessitated by another Federal law or regulation"). When an employer points to a legitimate, nondiscriminatory reason for an adverse employment action, the employee must show that the reason put forth was not true, but a pretext, a dishonest explanation, or a lie. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004). Constellation cites to cases involving unescorted access denials based on fitness determinations related to the plaintiffs' disabilities. [11] at 20–21. These cases were dismissed on summary judgment when there was no dispute of fact that the denials were based on legitimate, non-discriminatory reasons under the NRC regulations. *See, e.g., Flaherty v. Entergy Nuclear Operations, Inc.*, 946 F.3d 41, 54–55 (1st Cir. 2019); *McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 415–18 (3d Cir. 2017); *Silver v. Entergy Nuclear Operations, Inc.*, 290 F.Supp.3d 234, 248–51 (S.D.N.Y. 2017); *Lute v. Dominion Nuclear Conn., Inc.*, No. 3:12-CV-01412(MPS), 2015 WL 1456769, at *10–11 (D. Conn. Mar. 30, 2015); *Sysko v. PPL Corp.*, No. 3:CV-07-0470, 2009 WL 4725240, at *8 (M.D. Pa. Dec. 2, 2009). Because the plaintiffs did not show that the unescorted access denials were pretext for disability discrimination, they also failed to rebut the legitimate, nondiscriminatory reason for their termination—they were unqualified because they did not maintain unescorted access. *Id.*

Constellation argues that Thomas's claim similarly fails because it reads his allegations as conceding that he was not terminated because of his disability. [11] at 21 ("[D]iscovery will not change the fact that absent Unescorted Access clearance, Plaintiff was legally prohibited from working at [Constellation]."). This argument relies on the faulty premise that Thomas's unescorted access denial was legitimate and nondiscriminatory. *See* [11] at 21. Thomas alleges that Constellation's legitimate, non-discriminatory reason for denying him unescorted access and then terminating him was a pretext for disability discrimination. [1] ¶¶ 28–32. Discovery may show that the MRO and supervisor did not discriminatorily base the revocation on Thomas's disability (instead they, for example, genuinely believed that he had been untruthful in his interviews). But at this stage, I accept Thomas's allegations as true. Thomas has stated a claim for discrimination under the ADA.

## IV. Conclusion

Defendant's motion to dismiss, [10], is denied.

ENTER:

/s/ Manish S. Shah

Manish S. Shah
United States District Judge

Date: June 9, 2025